The Chancellor.
This bill is filed upon that provision of our statute which gives the court jurisdiction in cases of extreme cruelty, in either of the parties, to decree a divorce from bed and board for ever thereafter, or for a limited time, as shall seem just and reasonable.
The complainant is a woman of about forty years of age, and the defendant over sixty. They were married on the 16th of January, 1850; and on the thirty-first day of August, 1852, the complainant, with her two children of the marriage, left the defendant’s house, with the intention of a permanent separation from him.
The bill states that the defendant, when it became manifest that the complainant was pregnant of her second child, and about three months before its birth, treated her with great neglect and cruelty, entirely avoiding speaking *196 to her, except for the purpose of calling her the most disgraceful and opprobrious names; and that, both before and after the birth of the child, he stated to the neighbors that he was not the father of the child, but that it was the child of a clerk in his store, and that the complainant had been in bed with another young man also, who had been in the defendant’s employ.
The bill further states, that the defendant has, without any provocation, often threatened the complainant with personal violence, and has followed her about the house with his cane raised in a threatening position, and has told her to leave his house with her bastard child ; and that, on the fourth of July previous to filing the bill, which was less than three weeks after the birth of her second child, and while she was still feeble from her confinement, the defendant, without any provocation on her part, violently. struck her, and told the inmates of the house that she deserved more severity, and that he could get rid of her for less than two hundred dollars. The complainant further states, that although, for the sake of her children, she was desirous of retaining her home in the family, yet such was the defendant’s treatment to her, that not only her reputation but her person was endangered by longer remaining: and she further states, that she is without property or means of support, and that her children are so young that they occupy all her time, and so prevent her doing what she otherwise might be able to do for a maintenance.
The allegations in this bill, if sustained by the evidence, are sufficient to warrant a decree for divorce. It is true the single act of personal violence, standing alone, would not be sufficient; but the question is, whether the act was committed under circumstances to furnish a reasonable apprehension that the continuance of the cohabitation would be attended with further personal injury ? It is not the amount or degree of personal violence actually used by which the court is governed in forming its judgment, *197 but it is the apprehended danger, which the actual violence committed may reasonably excite, against which the court will extend its protection to the injured party. As was said in Evans v. Evans, 1 Haggard’s Ecc. Rep. 312, the court is not to wait till the hurt is actually done. Where the evidence shows a reasonable apprehension of bodily hurt the court will act. The suit for divorce on the ground of cruelty is substantially a proceeding quid timet. The court interferes not so much to punish an offence already committed, as to relieve the complainant from an apprehended danger. Bishop on Marriage and Divorce 456. In Harris v. Harris, 2 Phillim. 204, it is said, “ It is not the habit of the court to interfere in ordinary domestic quarrels; there must be something which makes cohabitation unsafe: for there may he much unhappiness from unkind treatment and from violent and abusive language; but the court will not interfere — -it must leave parties to the correction of their own judgment — they must hear, as well as they can, the consequences of their own choice. Words of menace are different: if they are likely to he carried into effect, the court is called upon to prevent their being carried on to mischief. Where blows are resorted to, the case is still more aggravated; there mischief is actually done or inflicted to a certain degree.”
In the case of Atkins v. Atkins, decided by the Massachusetts Supreme Court, March term, 1849, to he found in a note in Bishop on Marriage and Divorce 465, the facts were very similar to those stated in this bill. They were these. The parties had been married but a few months; the age of the husband was sixty years, and of the wife only twenty-two. After they had lived together some four months, the husband took the fancy into his head, without any provocation whatever, that his wife was unfaithful. He used, on various occasions, abusive language to her, calling her a “ prostitute,” accusing her of criminal connection with a young man by the name of Wigglesworth; and these calumnies he also asserted to other per- *198 sops. He also used towards her personal violence on several occasions, shaking his fist in her face, accompanied with the violent language above stated, attempting to drive her out of the house. On one occasion he seized her violently by the arm, for the purpose of expulsion. A divorce was decreed in the case. In giving their opinion, the court say: “ the law does not require many acts of .cruelty — one is enough, if it induces the court to think that the wife is in danger of bodily harm.” In Massachusetts, the language used in their statute is the same as in ours, “ extreme cruelty.” It must be bodily harm, and not mere mental sufferings, to answer the language of the statute; hut as has before been remarked, it is not to punish acts of personal violence, actually committed, that the court interferes, but to afford protection from future' injury. In the case of Grœcen v. Grœcen, 1 Green’s Ch. Rep. 459, it was decided, that it is not necessary that actual violence be shown to entitle the party to a decree on the ground of extreme cruelty.
In the present case, the defendant admits, in his answer, that on the 4th of July, as alleged in the bill, he used personal violence towards the complainant with his cane. He does not pretend there was any particular provocation for it at the time. He excuses himself by saying, that it was because of her general treatment of him. He says he did not strike her, but only pushed her with his cane. But Mrs. Thompson, a neighbor, says, that complainant came over to her house at eight or nine o’clock in the morning, and wanted to see her. She said Mr. Cook had struck her; she pulled off her sun-bonnet, and showed Mrs. Thompson where she had been struck — “it was swelled, and very red.” On the evening of the 4th of July, the complainant went over to Mrs. Thompson, and said she was afraid to stay all night in the house with the .defendant, as he was behaving so violently. A Miss Tunison went, and stayed all night with her; and for five or six nights one of Mrs. Thompson’s daughters remained with complainant all night.
*199 Mrs. Jenkins represents the conduct of the defendant towards his wife as most cruel and inhuman. This witness went, in the month of May, to nurse Mrs. Cook during her last confinement. She found her confined to her room in a very feeble state of health, so that she could not sit up, except a part of the time. It was on Thursday that Mrs. Jenkins went there. It was not till the following Tuesday that complainant went to the room of his wife. His first salutation was, “ I suppose you have come to nurse this woman; but I tell you now, I won’t pay you for taking care of her.” He said she was a bad woman — ■ she was a dirty hussy, and ought to suffer; that the child she was going to have was not his. He said the child belonged to Abraham Provost. The only reply Mrs. Cook made was, “the child is yours, and no one’s else.” Abraham Provost was a clerk in complainant’s store. At another time, complainant told Mrs. Jenkins that he had locked Mrs. Cook out of the bed-room, and he believed she had gone that night and slept with Eomer, who was one of his clerks. Mrs. Jenkins says she has known complainant to order his wife from the table, saying he would not eat with the dirty hussy. Tie frequently called her this name. He called her a dirty whore, and other names not decent to mention. Mrs. Jenkins says, while she was there, she never heard him speak pleasantly to her; he would sometimes ask how that brat was getting along; and once, when he heard the child cry, he said, “that bastard squalls well.” Tie never spoke of Mrs. Cook in any other way, except as “that critter,” or that hussy. lie once asked how that critter was getting along. Mrs. Jenkins said she was poorly; and he said, it is a pity she wouldn’t die. When the child was born, Mrs. Jenldns wished to send for the doctor, and he refused to send. When Mrs. Jenkins was going away, he asked her, what that woman was going to do. Mrs. Jenkins replied, she supposed she would stay there. He said, the dirty whore, she ought to have her head broke, and she *200 would get it, if she didn’t leave there and clear out. During her sickness, complainant would not permit her to speak to him, and when she attempted it, would tell her to mind her own business. The witness says, that on these occasions she never knew Mrs. Cook to manifest any improper temper.
In addition to this evidence, the manner in which this suit has been conducted on behalf of the defendant manifests a malignant feeling towards his wife, which is implacable and calculated to excite a reasonable apprehension that a continuance of cohabitation with him would be attended with bodily harm.
He states, in his answer, that he had suspicions that his wife had had criminal intercourse with a clerk in his store, and affirms his belief that such suspicions are well founded. He says he observed many things in the conduct of his wife to excite and confirm these suspicions. The only fact he ever mentioned for the foundation of such a charge, when called upon for his proof, was, that he once saw her talking to the clerk while he was splitting wood in the yard.
The attempt is made, without putting anything of the kind in issue by his answer, to show, by a number of witnesses, that his wife, previous to her marriage with him, was a common prostitute, and had the venereal disease. The attempt is a total failure. There is not the slightest foundation for the charge. The evidence by which it is endeavored to be established is not competent, and such as it is, no one would credit it for a moment. It was unnecessary for Mrs. Cook to call the witnesses she did to establish her good character. She shows that her character was irreproachable, until it was contaminated by being identified with that of the defendant. A more cruel and wanton effort to destroy a woman can hardly be conceived. After such an attempt, it can scarcely be believed that the defendant would appear before this court by his counsel, and ask that his wife might, by the decree of the *201 court, be sent back to Ms bed and board. The court would hardly permit her to do so, if she were willing. It may be said, that the court must look at the case as the bill presents it, and must confine itself to matters which occurred previous to the commencement of the suit. But the court may look at the conduct of the husband towards the wife, since the commencement of the suit, for the purpose of giving character to the acts which are relied upon as grounds for the divorce. The malignity with which the defendant has prosecuted his defence in this suit is enough to satisfy any reasonable man that it is the opportunity only that is wanted, and some plausible excuse for him to carry into execution the threat he made to Mrs. Jenkins, when he said, “the dirty whore, she ought to have her head broke, and she would get it, if she did not leave there, and clear out.”
I have no hesitation in decreeing a divorce from bed and board for ever. The children must remain with the mother, and I shall make a reference to a master to fix a sum to be paid by the defendant for the maintenance of his wife and children.